UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SONYA TAYLOR,
c/o National Health Law Program
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514;

CONTONNIA M. TURNER, JR.
c/o National Health Law Program
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514;

ROB BRICKEN,
c/o National Health Law Program
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514;

EMILY BYRD,
c/o National Health Law Program
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514;

LAUREN BUSH,
c/o National Health Law Program
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514;

AMERICAN COLLEGE OF PHYSICIANS,
190 North Independence Mall West
Philadelphia, PA 19106;

AMERICAN ACADEMY OF PEDIATRICS,
345 Park Boulevard
Itasca, IL 60143;

SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE,
1061 American Lane, Suite 310
Schaumburg, IL 60173;

DOCTORS FOR AMERICA,
2300 18th Street NW
Washington, DC 20009;

Case No.

**COMPLAINT**

NEW HAMPSHIRE MEDICAL SOCIETY,
Two Capital Plaza, Suite 401
Concord, NH 03301;

NEW HAMPSHIRE CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS,
7 North Street
Concord, NH 03301; and

CITY OF COLUMBUS,
90 W. Broad St.
Columbus, OH 43215,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,
200 Independence Avenue, S.W.
Washington, DC 20201;

MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services,
7500 Security Boulevard
Baltimore, Baltimore County, MD 21244;

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, DC 20201; and

CENTERS FOR MEDICARE & MEDICAID SERVICES,
7500 Security Boulevard
Baltimore, Baltimore County, MD 21244,

Defendants.

## INTRODUCTION

1. The Medicaid Act establishes a health coverage program for low-income people and people with disabilities. These groups are more likely to be in poor health, have chronic illnesses and conditions, and carry medical debt.

2. In July 2025, Congress enacted the One Big Beautiful Bill Act, also known as H.R. 1, amending the Medicaid Act to require community engagement (also called "work requirements") as a condition of receiving Medicaid coverage. The work requirements apply to individuals in the expansion population group: low-income adults, ages 19-64, who are not eligible for Medicare and are not eligible for Medicaid on the basis of pregnancy, disability, or parental status. *See* 42 U.S.C. § 1396a(xx)(9)(A)(i), 1396a(a)(10)(A)(i)(VIII).

3. The statute specifies individuals who, despite being in the Medicaid expansion population, must be excluded from work requirements. Among these specified excluded individuals is any individual "who is medically frail or otherwise has special medical needs . . . including an individual" who falls within one of five categories. *Id.* § 1396a(xx)(9)(A)(ii)(V). The categories are individuals who are: (1) "blind or disabled (as defined in section 1382c of this title)"; (2) "with a substance use disorder"; (3) "with a disabling mental disorder"; (4) "with a physical, intellectual, or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living"; or (5) "with a serious or complex medical condition." *Id.*

4. H.R. 1 required the Secretary of Health and Human Services (HHS) to issue regulations implementing the work requirements. Acting through the Centers for Medicare & Medicaid Services (CMS), HHS issued an Interim Final Rule: Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) (IFR).

5. The IFR improperly restricts the "medically frail" exclusion in several respects.

6. First, the IFR declares that individuals who fall within one of the five statutory medically frail categories must further establish that their condition "significantly impairs [their] ability to comply with the community engagement requirement." 42 C.F.R. § 435.554(c)(5)(i). This provision of the IFR violates the statute and does not reflect reasoned decision-making.

7. Second, the IFR denies the exclusion for some individuals "with a substance use disorder." Under the rule, individuals who have a substance use disorder (SUD) but are in "stable recovery" (defined as at least five years) do not qualify for the exclusion. *Id.* § 435.554(c)(5)(i)(B). This provision of the IFR violates the statute and does not reflect reasoned decision-making.

8. Further, the IFR establishes unduly burdensome procedures for individuals to verify that they are medically frail. Defendants failed to articulate a rational explanation for adopting these more onerous procedures.

9. As a result of the IFR, medically frail individuals will lose health coverage to a far greater degree than anticipated by Congress. Independent experts project the statute, as enacted, would cause about 6.4 million people to lose coverage on an average annual basis between 2027 and 2034. With the IFR's additional restrictions, those losses are estimated to increase to around 8.2 million people each year—a roughly 30 percent increase. Patricia M. Boozang et al., *CMS' Medicaid Work Requirements Rule: A 50-State Analysis of Additional Coverage Losses, FFY 2027-2034*, Manatt (July 16, 2026), https://perma.cc/G65V-F4UG.

10. The IFR will harm medically frail individuals. This includes people with cancer, diabetes, HIV, and SUDs and other behavioral health conditions who need ongoing medical care

to maintain their health, prevent deteriorating health conditions and relapses, and avoid catastrophic medical debts.

11. The IFR will harm Medicaid-participating health care providers. These providers diagnose, counsel, treat, and document their Medicaid patients' care, although they are often reimbursed by Medicaid at or below the cost of providing that care. Because of the IFR, health care providers will shoulder additional responsibilities associated with evaluating and documenting whether their patients can meet work requirements—decisions that are not medical in nature. Providers will not be compensated for this time-consuming process, even as these new responsibilities will interfere with their efforts to provide medical care.

12. The IFR will harm cities and localities. Cities and localities provide a range of health services, including public health and emergency care services, to Medicaid beneficiaries and the uninsured. When they provide services for residents who lose their Medicaid coverage, they do so without compensation. Because the IFR will create more widespread coverage loss than anticipated through the statute, locally funded health care providers will face higher uncompensated care costs and reduced revenue.

13. Because the challenged provisions of the IFR are both arbitrary and capricious and contrary to law, they are unlawful under the Administrative Procedure Act (APA) and should be vacated.

## JURISDICTION AND VENUE

14. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, as this case arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. This action and the

relief requested are authorized by 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 705 and 706, and Federal Rule of Civil Procedure 65.

15. Venue is proper under 28 U.S.C. § 1391(b)(2) and (e).

**PARTIES**

16. Plaintiff Sonya Taylor lives in Illinois and is enrolled in Medicaid.

17. Plaintiff Contonnia M. Turner, Jr. lives in Indiana and is enrolled in Medicaid.

18. Plaintiff Robert Bricken lives in Kentucky and is enrolled in Medicaid.

19. Plaintiff Emily Byrd lives in Missouri and is enrolled in Medicaid.

20. Plaintiff Lauren Bush lives in North Carolina and is enrolled in Medicaid.

21. Plaintiff the American College of Physicians, Inc. (ACP) is a professional organization comprised of 161,000 internal medicine specialists, related subspecialists, and medical students who apply clinical expertise to the diagnosis, treatment, and compassionate care of patients in every state in the country, including Medicaid expansion patients.

22. Plaintiff the American Academy of Pediatrics (AAP) is the nation's premier professional organization for pediatric medicine and serves as an independent forum for addressing children's health. The AAP's membership includes 67,000 pediatricians nationwide, who are providing direct care to young adults who receive Medicaid coverage through their state's expansion program.

23. Plaintiff the Society for Adolescent Health and Medicine (SAHM) is a multidisciplinary organization of physicians, nurses, psychologists, social workers, nutritionists, and other health professionals throughout the nation who are dedicated to improving the health and well-being of all adolescents and young adults. SAHM's members provide direct clinical care,

conduct research, and shape policy on behalf of young people roughly ages 10 through 25, including those enrolled through the Medicaid expansion.

24. Plaintiff Doctors for America (DFA) is a not-for-profit, § 501(c)(3) organization with more than 42,000 member physicians and medical trainees (including medical residents and students) in all 50 states. DFA doctors provide a range of health care services to their patients, including patients who receive Medicaid coverage through their state's expansion program. DFA mobilizes doctors, medical trainees, and other health professionals to be leaders who put patients over politics to improve the health of patients, communities, and the nation.

25. Plaintiff the New Hampshire Medical Society (NHMS) is a non-profit organization with more than 2,000 members, who are physicians practicing in the State of New Hampshire. NHMS members treat patients who are enrolled through the Medicaid expansion. NHMS is dedicated and committed to advocating for patients, physicians, the medical profession and health related rights, responsibilities and issues for the betterment of public health in the Granite State. Uniting together as physicians and healthcare advocates with one voice, NHMS plays an important role in helping to shape the future of medicine in New Hampshire.

26. Plaintiff the New Hampshire Chapter of the American Academy of Pediatrics (NHAAP) is a non-profit organization with more than 200 members, also known as the New Hampshire Pediatric Society. NHAAP's members, who are all also members of AAP, treat patients who are enrolled through the Medicaid expansion. NHAAP's mission is to unite the pediatric community and the community at large around innovative solutions to the most critical challenges facing children in New Hampshire, their families, and the pediatricians who care for them.

27. Plaintiff the City of Columbus, Ohio is a municipal corporation organized under Ohio law. *See* Ohio Const. art. XVIII. Columbus has all the powers of local self-government and

home rule under the constitution and laws of the State of Ohio, which are exercised in the manner prescribed by the charter of the City of Columbus. *See* Code of Ordinances, Columbus City Codes (May 28, 2025), https://perma.cc/B9VK-D6JH; Ohio Rev. Code Ann. § 715.01 (West 1953). Columbus, the capital of Ohio, is located in Franklin County, where nearly 115,000 people are enrolled in the Medicaid expansion program. Health Pol'y Inst. of Ohio, Ohio Medicaid Basics (Feb. 2025), https://perma.cc/H2WB-6X5H. Over two-thirds of Franklin County residents live within the Columbus City limits. Columbus's health centers and community clinics provide a wide range of services to low-income and uninsured people, including chronic disease management and behavioral health services.

28. Defendant Robert F. Kennedy, Jr., is Secretary of the United States Department of Health and Human Services and is sued in his official capacity.

29. Defendant Mehmet Oz is Administrator of the Centers for Medicare & Medicaid Services and is sued in his official capacity.

30. Defendant United States Department of Health and Human Services is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

31. Defendant Centers for Medicare & Medicaid Services is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act.

## STATUTORY AND REGULATORY BACKGROUND

### A. The Medicaid Program

32. Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-8. Medicaid's purpose is to enable each state, as far as practicable, to furnish "medical assistance" to individuals

"whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id*. § 1396-1.

33. "[M]edical assistance" includes a range of "care and services" that participating states must cover or are permitted to cover. *Id*. § 1396d(a); *see id*. § 1396a(a)(10)(A) (indicating which services are mandatory).

34. Although states do not have to participate in Medicaid, all states do.

35. States and the federal government share responsibility for funding Medicaid. The HHS Secretary must pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id.* §§ 1396b(a)(1), 1396d(b). In general, the federal share is based on the state's relative per capita income. States receive enhanced federal reimbursement for medical assistance provided to the expansion population. *Id*. § 1396d(y) (setting the rate at 90% in 2020 and thereafter).

**B. Medicaid Eligibility and Coverage Requirements**

<u>Eligibility</u>

36. The Medicaid Act identifies population groups that states must cover and gives states the option to cover additional population groups. *Id*. § 1396a(a)(10)(A), (C).

37. States must cover individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or have a specific immigration status. *Id*. §§ 1396a(a)(10)(A), 1396a(b)(2), (3), 1396b(v); 8 U.S.C. §§ 1611-1613, 1641. Mandatory Medicaid population groups include: children; parents and other caretaker relatives; pregnant women; and the elderly, blind, and disabled. 42 U.S.C. § 1396a(a)(10)(A)(i).

38. In 2010, Congress enacted comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (ACA). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

39. As part of the ACA, Congress amended the Medicaid Act to add, as a mandatory population group, adults who are under age 65, are not eligible for Medicare, do not fall within another mandatory Medicaid eligibility category, and have household income below 133% of the federal poverty level (FPL) (that is, below $21,227 per year for a single-person household, for the current year). 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14); Annual Update of the HHS Poverty Guidelines, 91 Fed. Reg. 1797 (Jan. 15, 2026).

40. In *National Federation of Independent Business v. Sebelius*, the U.S. Supreme Court held that HHS could not terminate all Medicaid funding to states that fail to extend Medicaid coverage to the expansion population. 567 U.S. at 585 (plurality opinion). To date, 40 states and the District of Columbia have implemented the Medicaid expansion.

41. The HHS Secretary cannot promulgate "any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114.

42. The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility for care and services . . . and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

43. Existing regulations detail how states must determine eligibility for Medicaid applicants and redetermine eligibility for beneficiaries. 42 C.F.R. §§ 435.900 to 435.960.[1] *See id.* § 435.916 (requiring periodic redetermination of eligibility).

44. A state must redetermine eligibility without requiring information from the beneficiary if it is able to do so based on reliable information available to the state Medicaid agency, including information in its existing records or available through electronic data sources. *Id.* § 435.916(a)(2); *see id.* §§ 435.948, 435.949. This process is known as *ex parte* redetermination.

45. If available information is insufficient to redetermine eligibility, the agency must send the beneficiary a renewal form (populated with available information) and request the missing information. *Id.* § 435.916(a)(3)(i).

46. The agency must verify information submitted by the beneficiary at application and renewal. *Id.* § 435.916(a)(3)(ii); *see id.* §§ 435.945 to 435.956.

47. Unless the Medicaid Act requires other procedures (*e.g.*, for verification of citizenship and immigration status), the agency is entitled to accept self-attestation of information that is necessary to determine eligibility, without requiring further information (including documentation) from the individual. *Id.* § 435.945(a).

48. If information provided by an individual on an application or renewal form is not reasonably compatible with information obtained by the state agency through data sources, the agency must seek additional information from the individual. *Id.* § 435.952(c)(2). The additional information can take the form of a statement that reasonably explains the discrepancy or other information, which can include documentation. *Id.* § 435.952(c)(2)(i)-(ii). However, the agency

[1] Portions of the IFR amended several of these regulations. *See* 91 Fed. Reg. at 33352-53 (explaining the changes). These changes do not affect the substantive requirements referenced here.

cannot require documentation unless electronic data is not available and establishing a data match would not be effective. *Id*. § 435.952(c)(2)(ii). Further, the agency must permit, on a case-by-case basis, self-attestation for all eligibility criteria (other than citizenship or immigration status) when documentation does not exist or is not reasonably available. *Id*. § 435.952(c)(3).

49. As described in section D below, the IFR deviates from these longstanding requirements for purposes of determining medically frail status.

Scope of Coverage

50. The Medicaid Act sets forth mandatory services that participating states must cover and optional services that participating states can elect to cover. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).

51. In 2006, Congress amended the Medicaid Act to give states flexibility to provide a different scope of benefits—"benchmark" or "benchmark equivalent" coverage—in some parts of the state and/or to certain population groups. *See* Deficit Reduction Act of 2005, Pub. L. 109-171, § 6044, 120 Stat. 4, 88 (2006) (codified at 42 U.S.C. § 1396u-7). The scope of benefits covered can be narrower than what is otherwise covered. "Benchmark" or "benchmark equivalent" coverage is now called Alternative Benefit Plan (ABP) coverage.

52. The Medicaid Act bars states from requiring all beneficiaries to enroll in an ABP. 42 U.S.C. § 1396u-7(a)(2)(B). For example, the state cannot require such enrollment if "[t]he individual is medically frail or otherwise an individual with special medical needs (as identified in accordance with regulations of the Secretary)." *Id*. § 1396u-7(a)(2)(B)(vi).

53. The regulations, while allowing states to define who is "medically frail or otherwise an individual with special medical needs," require that definition to include six listed categories of individuals. 42 C.F.R. § 440.315(f). Along with children under age 19, the remaining five

categories are individuals with: "disabling mental disorders (including children with serious emotional disturbances and adults with serious mental illness)"; "chronic substance use disorders"; "serious and complex medical conditions"; "a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living"; and "a disability determination based on Social Security criteria." *Id*.

54. HHS created these six categories to ensure that individuals with significant health care needs maintain access to comprehensive health coverage. *See, e.g.*, Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, 78 Fed. Reg. 42160, 42231, 42233 (July 15, 2013).

55. In the ACA, Congress directed states to provide coverage to the Medicaid expansion population through an ABP. 42 U.S.C. § 1396a(k)(1). However, if an individual enrolled in the expansion population is medically frail, they must be given the option of an ABP that offers the same coverage that is available to other Medicaid population groups. *Id.*; *see* 42 C.F.R. § 440.315.

**C. The 2025 One Big Beautiful Bill Act**

56. Last summer, Congress passed H.R. 1, which made significant changes to the Medicaid Act. *See* One Big Beautiful Bill Act, Pub. L. No. 119-21, § 71101-71121, 139 Stat. 72 (2025). Several of the changes are specific to the Medicaid expansion population.

57. Starting January 1, 2027, states must redetermine eligibility every six months for individuals enrolled in the expansion population. *Id*. § 71107 (codified at 42 U.S.C. § 1396a(e)(14)(L)).

58. Also starting January 1, 2027, states must require certain individuals to demonstrate compliance with "community engagement" as a condition of eligibility for Medicaid. *Id*. § 71119(a) (codified at 42 U.S.C. § 1396a(xx)).

59. The new work requirements only apply to "applicable individuals." 42 U.S.C. § 1396a(xx)(1). An applicable individual is defined to include an individual who is eligible to enroll or is enrolled in the Medicaid expansion population under the state plan. *Id*. § 1396a(xx)(9)(A)(i).

60. The law carves out "specified excluded individuals" from the definition of applicable individuals. *Id*. A specified excluded individual is an individual who is: described in § 1396a(a)(10)(A)(i)(IX) (describing former foster care children); an American Indian; the parent, guardian, caretaker relative, or family caregiver of a child under age 14 or a disabled individual; a veteran with a total disability; in compliance with the Temporary Assistance for Needy Families work requirement or a member of a household that receives Supplemental Nutrition Assistance Program (SNAP) benefits and is not exempt from the SNAP work requirement; participating in a drug addiction or alcoholic treatment and rehabilitation program (defined in 7 U.S.C. § 2012(h)); an inmate of a public institution (*i.e.*, prison or jail); or pregnant or entitled to postpartum Medicaid coverage. *Id*. § 1396a(xx)(9)(A)(ii)(I-IV), (VI-IX).

61. The term "specified excluded individual" also includes an individual "who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual" who falls within one of five listed categories. *Id*. § 1396a(xx)(9)(A)(ii)(V). Those categories are individuals: who are "blind or disabled (as defined in section 1382c of this title)"; "with a substance use disorder"; "with a disabling mental disorder"; "with a physical, intellectual

or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living"; or "with a serious or complex medical condition." *Id*.

62. Section 1382c defines who is "blind" or "disabled" for Supplemental Security Income purposes. An individual is considered disabled if they are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id*. § 1382c(a)(3)(A). Generally, an individual is considered blind if their central visual acuity is below a specified limit. *Id*. § 1382c(a)(2).

63. Those who are subject to the work requirements—applicable individuals—can demonstrate compliance in a given month by: working 80 hours; completing 80 hours of community service; participating in a work program for 80 hours; being enrolled in an education program at least half time; engaging in a combination of the above activities for 80 hours; having a monthly income of at least the federal minimum wage multiplied by 80 hours; or, for seasonal workers, having an average monthly income over the preceding six months of at least the federal minimum wage multiplied by 80 hours. *Id*. § 1396a(xx)(2).

64. Applicable individuals who are submitting a Medicaid application must demonstrate compliance for the month preceding the month of application. *Id*. § 1396a(xx)(1)(A); *see id*. (giving states the option to require compliance for up to three consecutive months preceding the month of application). Once enrolled in Medicaid, applicable individuals must demonstrate compliance for one or more months during the six-month period between each regularly scheduled eligibility redetermination. *Id*. § 1396a(xx)(1)(B)(i), 1396a(e)(14)(L); *see id*. § 1396a(xx)(1)(B)(ii), 1396a(xx)(4) (giving states the option to require more frequent compliance checks).

65. An applicable individual who was a specified excluded individual for part or all of a month must be deemed compliant for that month. *Id*. § 1396a(xx)(3)(A)(i)(I).

66. To verify that an applicable individual met the work requirements or must be deemed compliant, or that an individual is a specified excluded individual, states must "establish processes and use reliable information available to the State . . . without requiring, where possible," the individual to submit additional information. *Id*. § 1396a(xx)(5).

67. The statute permits states to "elect to not require an individual to verify information" that resulted in the state deeming them compliant. *Id*. § 1396a(xx)(3)(A).

68. If a state cannot verify that an individual met the work requirements, it must give the individual an opportunity to show that they met them, should be deemed to have met them, or is not an applicable individual. *Id*. § 1396a(xx)(6)(A)(i)-(ii). If the individual does not make a satisfactory showing, the state must deny their Medicaid application or disenroll them from coverage. *Id*. § 1396a(xx)(6)(A)(iii).

69. Congress directed the HHS Secretary to promulgate an interim final rule to implement the work requirements no later than June 1, 2026. Pub. L. No. 119-21, § 71119(d).

**D. CMS's Interim Final Rule**

70. CMS published the IFR on June 3, 2026. Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) (codified in relevant part at 42 C.F.R. §§ 435.550 to 435.563); *see* Medicaid Program; Community Engagement Requirement for Certain Individuals, Correction, 91 Fed. Reg. 39028 (June 29, 2026) (correcting 42 C.F.R. §§ 435.557, 435.558). The IFR is effective as of July 31, 2026. 91 Fed. Reg. at 33348.

71. CMS claimed the work requirements have "the potential to empower Medicaid beneficiaries through employment, education, or volunteer service so they can escape isolation and dependency, build confidence, and achieve self-sufficiency and independence." *Id*. at 33349. CMS also claimed the work requirements will lead to better health outcomes. *Id*. at 33349-50.

72. Those claims ignored HHS's and CMS's own prior review of the evidence on the effects of work requirements in Medicaid.

73. Between 2017 and 2021, CMS authorized 13 states to implement projects that conditioned Medicaid eligibility on compliance with a work requirement. *Id*. at 33350.

74. In 2021, HHS's Office of the Assistant Secretary for Planning and Evaluation (ASPE) evaluated the data that emerged from those projects. *See* Assistant Sec'y for Plan. & Evaluation, Off. of Health Pol'y, HHS, *Medicaid Demonstrations and Impacts on Health Coverage: A Review of the Evidence* (Mar. 11, 2021), https://perma.cc/D352-Y3WN. At that time, Arkansas was the only state to have fully implemented their approved work requirements. After examining peer-reviewed research, HHS concluded the Arkansas work requirements did not increase "employment or other community engagement activities," but did cause a significant reduction in Medicaid coverage. *Id*. at 2 (citing Benjamin D. Sommers et al., *Medicaid Work Requirements – Results from the First Year in Arkansas*, 381 New Eng. J. Med. 1073 (2019)). Coverage loss was more pronounced among individuals with chronic health conditions. *Id*. (citing Lucy Chen & Benjamin D. Sommers, *Work Requirements and Medicaid Disenrollment in Arkansas, Kentucky, Louisiana, and Texas, 2018*, 110 Am. J. Pub. Health 1208 (2020)). Further, coverage loss was associated with a range of negative health and financial consequences. Individuals faced medical debt and postponed seeking health care and taking medications due to

cost. *Id*. (citing Benjamin D. Sommers et al., *Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care*, 39 Health Affs. 1522 (2020)).

75. CMS explained these research findings in greater detail when it withdrew its approval of these work requirements. *See, e.g.*, Letter from Elizabeth Richter, Acting Adm'r, CMS, to Dawn Stehle, Deputy Dir. for Health & Medicaid, Ark. Dep't of Hum. Servs. 4-9 (Mar. 17, 2021), https://perma.cc/T3U9-CCJS (concluding the "findings indicate the serious and potentially long-term implications of the [work requirements] in terms of lost coverage and foregone health care among those who most need it").

76. In addition, CMS pointed to evidence from Arkansas, New Hampshire, and Michigan indicating that "even individuals who were working or those who had serious health needs, and therefore should have been eligible for exemptions, lost coverage or were at risk of losing coverage because of complicated administrative and paperwork requirements." *Id*. at 8; *see also* Letter from Elizabeth Richter, Acting Adm'r, CMS, to Lori Shibinette, Comm'r, N.H. Dep't of Health & Hum. Servs. 6 (Mar. 17, 2021), https://perma.cc/5DM4-SBYW (noting in New Hampshire "providers were resistant to signing forms needed to establish that the beneficiary was unable to work so that the beneficiary could qualify for an exemption"); Dep't of Health & Hum. Servs., Off. of Gen. Counsel, Advisory Opinion 24-01 on Medicaid Section 1115 Demonstrations Imposing Work Requirements (Dec. 11, 2024), https://perma.cc/F78C-BTZV.

77. In the IFR, CMS did not grapple with the substantial evidence regarding the negative effects of these previous Medicaid work requirements on low-income individuals.

78. Instead, CMS only made the vague statement that the experience in Arkansas and Georgia "provides insight into operational considerations, indicating that beneficiary awareness,

clarity of requirements, and the accessibility of reporting mechanisms, as well as overall administrative complexity, can influence participation and compliance." 91 Fed. Reg. at 33350.

79. When the IFR was issued, ASPE released a report claiming that Medicaid work requirements would improve household earnings and move millions of people out of poverty. *See* Danielle Berman et al., Off. of the Assistant Sec'y for Plan. & Evaluation, HHS, *Medicaid Work Requirements Incentivize Employment and Are Estimated to Reduce Poverty* (June 1, 2026), https://perma.cc/8NW9-GHRZ. As two former ASPE directors have explained, the report is fatally flawed; the estimates "rest on completely unrealistic assumptions" that made them "of limited use in assessing likely policy outcomes." *See* Richard G. Frank & Sherry Glied, *ASPE's Analysis of Medicaid Work Requirements: Argument by Assumption*, Health Affs. Forefront (June 12, 2026), https://perma.cc/8R7U-VRCU.

Problems with the IFR's Medically Frail Definition

80. As noted above, Congress excluded from the work requirements any individual "who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual" who falls within one of five listed categories. 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V). The IFR adopted a definition of "medically frail or otherwise has special medical needs" that improperly limits who can qualify for the exclusion.

81. *First*, under the IFR, individuals who fall within one of the five listed categories do not categorically qualify as medically frail. They qualify as medically frail only if they can show they meet an additional requirement: their health condition "significantly impairs [their] ability to comply with the community engagement requirement." 42 C.F.R. § 435.554(c)(5)(i).

82. CMS indicated that restricting who is medically frail in this way could help beneficiaries "escape isolation and dependency, build confidence, achieve self-sufficiency and prosperity, and improve health." 91 Fed. Reg. at 33372, 33376.

83. CMS noted it rejected the definition of medically frail it adopted in the ABP regulation. To justify that decision, CMS highlighted slight differences between the language in the ABP regulation and the language Congress used in H.R. 1. *Id*. at 33372 (noting, among other things, that the statute includes blind individuals, "uses the term 'or' instead of 'and' for individuals with serious or complex medical conditions," and removes the term "chronic" for individuals with SUDs). CMS also noted the "medically frail exclusion for the ABP only impacts . . . benefit package selection, while the medically frail exclusion under the community engagement requirement determines if an individual needs to demonstrate community engagement to maintain Medicaid eligibility." *Id*. CMS did not explain the significance of these differences or why they led to a more restrictive definition of medically frail in the IFR.

84. Comments submitted to CMS in anticipation of the IFR raised significant concerns that individuals who Congress identified as medically frail will face serious health consequences if they lose their Medicaid coverage for failure to comply with the work requirements. *See* Ex. A (Nat'l Health Law Program comment); Ex. B (AIDS Inst. et al. comment and publication); Ex. C (HIV+HEP Pol'y Inst. comment). CMS did not acknowledge those concerns or otherwise consider this important issue.

85. *Second*, under the IFR, individuals "with a substance use disorder" do not categorically qualify as medically frail. They only qualify as medically frail if they are not "in stable recovery (which means, an individual who is in recovery for 5 or more years)." 42 C.F.R. § 435.554(c)(5)(i)(B).

86. CMS noted that "the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) and International Classification of Diseases and Related Health Problems, Tenth Revision (ICD-10) are most commonly used to define and classify SUDs." 91 Fed. Reg. at 33374.

87. Neither the DSM-5 nor the ICD-10 supports the IFR's departure from the statute's categorical exclusion of individuals with an SUD. The DSM-5 refers to an SUD as being "in remission" when an individual previously met the diagnostic criteria for the condition but has not met any of the criteria (other than craving or a strong desire to use the substance) for at least three months. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev.) (2022). An SUD is in "early remission" in months three through twelve and "sustained remission" after twelve months. *Id*.

88. CMS acknowledged that "under current clinical standards SUDs are chronic diseases and that individuals in recovery are considered to have an SUD." 91 Fed. Reg. at 33374.

89. Nevertheless, CMS stated it was appropriate to subject an individual "in stable recovery" to the work requirements because they are "better able to participate in community engagement activities than an individual who is in active treatment or early or sustained recovery." *Id*. In addition, CMS claimed the work requirements could help individuals "maintain their recovery by helping them escape isolation and dependency, build confidence, achieve self-sufficiency and prosperity, and improve health." *Id*.

90. The single article CMS cites in support of its explanation indicates there is no uniform definition or understanding of "recovery" or "be[ing] in recovery." *See id*. at 33374 (citing M.R. Frone et al., *Workplace Supported Recovery from Substance Use Disorders: Defining the Construct, Developing a Model, and Proposing an Agenda for Future Research*, 6 Occup. Health

Sci. 475 (2022), https://perma.cc/T5BL-WV2B). Further, the article indicates some workplace conditions and/or norms can be harmful to individuals with an SUD, undermining recovery.

91. Comments submitted to CMS in anticipation of the IFR expressed significant concerns that individuals with an SUD in remission will face serious health consequences if they lose their Medicaid coverage for failure to comply with the work requirements. *See, e.g.*, Ex. A (Nat'l Health Law Program comment). CMS did not acknowledge the commenters' concerns or otherwise consider this important issue.

Problems with the IFR's Medically Frail Verification Process

92. The IFR established verification procedures that will make it unduly burdensome for medically frail beneficiaries to obtain an exclusion from the work requirements on that basis.

93. *First*, as described above, to verify that someone is a specified excluded individual (and as a result, not subject to the work requirements), states must use reliable and available information "without requiring, where possible," the individual to submit additional information. 42 U.S.C. § 1396a(xx)(5).

94. In the IFR, CMS specified that to verify medically frail status, a state must use "reliable information available to the State, including claim(s) relevant to the individual that have been adjudicated in the preceding 12 months, including those that have been paid, pended, or denied, and encounter data, as relevant to the individual." 42 C.F.R. § 435.557(f)(1); *see id.* § 435.557(a)(vii), (viii). CMS prohibited states from using claims or encounter data older than 12 months. 91 Fed. Reg. at 33405.

95. To explain this restriction on the claims lookback period, CMS stated that older claims or encounter data might not "reflect the individual's current condition." *Id.*

96. In anticipation of the IFR, commenters submitted to CMS a research manuscript examining the relationship between the length of the claims/encounter data lookback period and the percentage of beneficiaries who would be identified automatically by the state as medically frail. *See* Ex. D. A 12-month lookback period led to 26.9% of beneficiaries being identified automatically, compared to 34.5% with a 24-month lookback period, and 39.3% with a 36-month lookback period. *Id*.

97. The researchers noted the time lag of up to 12 months (depending on the state) between the provision of a service and the submission of a claim would affect how their research would translate to the real world. *Id*.; *see* 42 C.F.R. § 447.45(d)(1) (allowing states to give providers up to 12 months from the date of service to submit a claim), (d)(2)-(4) (setting deadlines for states to pay claims they receive). Thus, for example, if a state wanted "to achieve a comparable lookback period as our 24-month base case scenario," it would "need to look at claims from at least 36-months prior to a redetermination to account for claims lag." Ex. D.

98. The researchers concluded the use of administrative claims data to automatically exclude beneficiaries from the work requirements would be key to reducing unintended coverage loss among the medically frail population, which is "at high risk for adverse health effects from coverage losses." *Id*.

99. Comments submitted in anticipation of the IFR indicated the importance of using claims data to identify individuals who are medically frail given the severe health consequences that flow from coverage loss. *See, e.g.*, Ex. E (Am. Med. Ass'n comment); Ex. F (Nat'l Council for Mental Wellbeing comment).

100. While CMS acknowledged the existence of a time lag in claims data, it did not acknowledge or engage with the important issues raised in the research manuscript or the

comments. In short, CMS did not grapple with the effects of its decision to prohibit states from using claims and encounter data older than 12 months.

101. *Second*, the IFR limits the use of self-attestation for medically frail people. Prior to January 1, 2028, states are permitted to accept self-attestation from applicants and beneficiaries when there is no reliable information available to the state or the reliable information is not reasonably compatible with information provided by the individual. 42 C.F.R. § 435.557(f)(1)(i). However, after January 1, 2028, a state is only permitted to accept self-attestation of medically frail status once during a period of enrollment. *Id*. § 435.557(f)(1)(ii). A "period of enrollment" is defined as "a continuous period of enrollment in coverage under the State plan or waiver without the individual being disenrolled, regardless of the number of consecutive eligibility periods, of redeterminations or renewals, or of transitions between eligibility groups." *Id*. § 435.557(a). After a state has accepted self-attestation once, it must verify medically frail status again in six months by using only reliable information available to the agency or documentation submitted by the individual. *Id*. § 435.557(f)(1)(ii)(A)-(B).

102. CMS did not apply the same limits on the use of self-attestation to verify that an applicant or beneficiary is compliant with the work requirements, must be deemed compliant, or is excluded from the work requirements on a basis other than being medically frail. *See id*. § 435.557(b)(2)(ii)-(iii). To the contrary, the IFR requires the state agency to accept self-attestation if there is no reasonably available documentation. *See id*. § 435.557(b)(2)(iii).

103. CMS stated that the restriction on the use of self-attestation to verify medically frail status "will motivate individuals to access care." 91 Fed. Reg. at 33406. CMS reasoned that once individuals are enrolled in coverage, they will be able to access necessary care and in turn, "their receipt of services will appear (with some degree of lag) in adjudicated claims or encounter data

(as applicable), which constitutes reliable information available to the State." *Id*. at 33407. CMS concluded states will be able to verify medically frail status on an *ex parte* basis during the required redetermination of eligibility every six months. *Id*. ("We expect that after individuals are enrolled and gain access to coverage, States generally will be able to reverify [medically frail status] on an *ex parte* basis using reliable information available to the State.")

104. However, CMS was aware that even if a beneficiary could receive necessary care immediately upon enrollment, the care would probably not appear in claims or encounter data within six months. *See, e.g.*, 42 C.F.R. § 447.45(d)(1) (allowing states to give providers 12 months from the date of the service to submit claims).

105. Further, comments submitted to CMS in anticipation of the IFR explained that individuals often cannot receive necessary care quickly. It can take many months or even years for individuals to see a health care professional and receive an accurate diagnosis. *See, e.g.*, Ex. F (Nat'l Council for Mental Wellbeing comment); Ex. G (P'ship to Protect Coverage comment); Ex. H (Am.'s Essential Hosps. comment). Medicaid beneficiaries can find it especially difficult to find a provider willing to treat them. *See* Ex. A (Nat'l Health Law Program comment).

106. In addition, comments cited evidence, including from the previous work requirement projects, showing administrative barriers deter and reduce coverage. *See* Exs. A, G.

107. Self-attestation is a reliable alternative to requiring documentation and helps ensure eligible individuals do not lose coverage for failure to obtain or submit documentation. *See, e.g.,* Exs. A, G. As noted above, comments raised concerns that individuals whom Congress identified as medically frail will face serious health consequences if they lose Medicaid.

108. CMS did not acknowledge or otherwise consider these important issues.

109. While the IFR anticipates health care providers will have to determine whether an individual is medically frail and give the individual the necessary documentation of both medical frailty and inability to meet the work requirement, *see* 91 Fed. Reg. at 33406, CMS did not consider the burden this will impose on providers. CMS did not consider whether providers are equipped to make non-medical decisions about an individual's ability to work or participate in various other activities for a certain number of hours per month. *Id*.

**E. Effects of the IFR on Plaintiffs**

110. As described below, each Plaintiff is an "adversely affected or aggrieved" party under the APA. 5 U.S.C. § 702.

The Individual Plaintiffs

111. Each individual Plaintiff is enrolled in Medicaid expansion. Beginning in 2027, the state will determine if they are a specified excluded individual or an applicable individual. *See* 91 Fed. Reg. at 33389, 33402, 33416. If they are determined to be an applicable individual, and they have not completed the required hours or made enough money, they will lose Medicaid. Specifically:

112. Plaintiff Sonya Taylor is 61 years old and lives in Chicago, Illinois.

113. Ms. Taylor earned a Bachelor of Arts in English in 1987 from Hollins College. She was a print and web designer for more than 35 years.

114. In January 2013, Ms. Taylor was not feeling well and went to a local retail clinic, where they tested her blood sugar. After seeing the test results, the clinic instructed Ms. Taylor to go to the emergency room. At the hospital, she was diagnosed with diabetic ketoacidosis, hyperglycemia, and type 2 diabetes.

115. Ms. Taylor was uninsured at the time because she had been laid off from her job a few months earlier. The hospital helped Ms. Taylor enroll in Cook County's pilot Medicaid expansion program, which covered her hospital expenses.

116. Before she was diagnosed with type 2 diabetes, Ms. Taylor had been diagnosed with high blood pressure and elevated cholesterol. She has also had two hip replacements. She experiences swelling and some sporadic pain in her legs that comes on quickly if she stands or sits too long. She must elevate her feet to relieve the pain and swelling. Ms. Taylor continues to be treated by specialists to help identify and address the cause of the pain.

117. The combination of her medical concerns increases the risk of heart disease and stroke, so her health must be carefully monitored and managed. Medicaid enables Ms. Taylor to live by covering medically necessary medications and ongoing doctors' visits

118. To control her diabetes, Ms. Taylor takes three separate prescription drugs, including a GLP-1. She monitors her blood sugar levels using various medical supplies and devices, including a glucose monitor, testing strips, lancets, and lancing devices.

119. Ms. Taylor takes two additional prescription medications: one to treat high blood pressure and one to address high cholesterol. She sees her primary care physician every three months for a diabetes check-up.

120. Ms. Taylor received a notice from the Illinois Medicaid program dated September 1, 2026, advising her she is a Medicaid expansion enrolled adult and will be subject to the work requirements.

121. Under the Medicaid Act, Ms. Taylor qualifies as medically frail because she has a serious or complex medical condition. Under the IFR, however, she will only be excluded from the work requirements as medically frail if she can show her health conditions significantly impair her

ability to comply with the work requirements. The IFR states that CMS does not expect that people with type 2 diabetes will typically meet that standard. 91 Fed. Reg. 33376.

122. Ms. Taylor does not fall within any other category of specified excluded individuals. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(I)-(IV), (VI)-(IX).

123. Ms. Taylor does not know how she will comply with the work requirements. She has been unemployed for the last four years. In 2022, she started her own business as a content manager and writer but has struggled to get the business off the ground. She has had a few freelance jobs over the last four years. However, she has not earned any income from that work since 2025.

124. Ms. Taylor wants to work and is frustrated she cannot find a job that accommodates her health conditions. She also suspects her age is preventing her from getting hired. Because she cannot stand for long periods of time without foot pain, she cannot accept a job in retail or a similar position without potentially impacting her health.

125. Losing Medicaid coverage would put Ms. Taylor's life at risk. Without Medicaid, she has no way to afford the medications and health care she needs to stay alive. She hates the feeling of limbo that she is in. She cannot control whether she can get a job, but her health insurance now depends on it. It is confusing, scary, stressful, and frustrating.

126. Plaintiff Contonnia M. Turner, Jr. is 40 years old and lives in Indianapolis, Indiana.

127. In 2009, Mr. Turner was diagnosed with HIV. This condition is well-managed due to medications he takes daily. He receives treatment at a clinic specializing in providing services to people living with HIV.

128. He was also diagnosed with narcolepsy in 2007. Some days Mr. Turner has difficulty getting out of bed in the morning. On good days, he still usually needs to take an afternoon nap. He is prescribed medication for this condition. Living with these health challenges has taken

a toll on Mr. Turner's mental health, contributing to periods of depression. He sees a therapist to help him manage his mental health.

129. Mr. Turner completed high school and obtained an associate's degree in graphic design. His work history includes retail and janitorial services. However, because of his narcolepsy, he has been fired from jobs, as well as ridiculed and harassed by co-workers. After being let go from a job in 2021, he lost his apartment and had to move back in with his mother.

130. Mr. Turner volunteers as an advocate in the HIV Modernization Movement and does outreach and education around HIV.

131. Mr. Turner is also an artist. He works in acrylic paint and 3D sculpture. He will occasionally get paid for his art. Mr. Turner estimates that through his work, he makes, at most, about $300 a month. Many months, he makes far less or nothing.

132. Through Mr. Turner's volunteering and gig work, he estimates that he averages less than ten hours a week in activities that may qualify towards the work requirements.

133. Under the Medicaid Act, Mr. Turner qualifies as medically frail because he has a serious or complex medical condition. Under the IFR, however, he will only be excluded from the work requirement as medically frail if he can show that his HIV and/or his narcolepsy significantly impair his ability to comply with the work requirements.

134. Mr. Turner does not fall within any other category of specified excluded individuals. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(I)-(IV), (VI)-(IX).

135. Mr. Turner does not know how he will comply with the work requirements. His narcolepsy can create scheduling difficulties that employers will not accommodate. He doubts that he will be able to find enough hours to consistently meet the 80 hour a month requirement or minimum income threshold.

136. Losing Medicaid coverage would put Mr. Turner's life at risk. Without Medicaid, he would likely experience significant disruptions to his health care. Additionally, he would not be able to afford the medication he routinely takes to treat his narcolepsy. The prospect of losing Medicaid is causing Mr. Turner to feel a deep sense of insecurity and stress.

137. Plaintiff Robert Bricken is 49 years old and lives in Covington, Kentucky.

138. In 2000, Mr. Bricken earned a B.A. with honors from the University of Kentucky. He was a double major in English and Foreign Language (Latin) Education.

139. Mr. Bricken is a gifted writer who spent 26 years specializing in writing, journalism, communications, and editing. Mr. Bricken is not currently working.

140. In 2016, Mr. Bricken's corneas began to deteriorate, causing blurred vision that made it difficult for him to read. Between 2018 and 2025, he underwent a grueling series of surgeries to try to preserve his vision: two corneal transplants in his left eye; one corneal transplant in his right eye; surgery to repair a detached retina in his left eye; two surgeries to repair a detached retina in his right eye; and cataract removal surgery in both eyes. During this time, he often had to stay home, limit his movement, and forgo using a computer or television for months at a time.

141. Mr. Bricken sees several providers for his vision problems, including an ophthalmologist, a retinal specialist, a glaucoma specialist, and a corneal specialist.

142. Mr. Bricken also takes three different prescription eye drops daily.

143. His vision remains impaired even with prescription glasses. He is legally permitted to drive but does not drive at night or in inclement weather because of his difficulty reading traffic signs in low vision situations. Mr. Bricken's biggest challenge is reading text. Although he is a professional writer and editor, he has not read a book in years due to his vision problems.

144. Mr. Bricken also has longstanding mental health conditions that his vision problems exacerbated. Since 2007, he has taken prescription medications to manage major depressive disorder, bipolar disorder, and anxiety disorder. Currently, Mr. Bricken is prescribed three daily medications to treat these conditions. During his years of vision issues, Mr. Bricken has also developed and been diagnosed with a severe alcohol use disorder. He sees a therapist two times per month to address these concerns.

145. Medicaid enables Mr. Bricken to receive the care he needs to monitor and treat his vision problems and to treat his mental health conditions.

146. On July 1, 2026, the state sent Mr. Bricken a letter explaining he is enrolled in Medicaid expansion and informing him of the work requirements.

147. Under the Medicaid Act, Mr. Bricken qualifies as medically frail because he has a serious or complex medical condition, a disabling mental disorder, and a substance use disorder. Under the IFR, however, he will only be excluded from the work requirements as medically frail if he can show his conditions significantly impair his ability to comply with the work requirements.

148. Mr. Bricken does not fall within any other category of specified excluded individuals. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(I)-(IV), (VI)-(IX).

149. Mr. Bricken does not know whether he will be able to comply with the work requirements. After his sixth eye surgery in May 2023, he had to stop working for a time and could not look for an alternative job because he was unable to use a screen. This problem was further exacerbated by his seventh eye surgery in November 2023. He took on freelance projects in 2024, but his vision made the work very difficult, and the pay did not justify the effort.

150. Given the degradation to his vision, he decided to change professions. He is actively looking for work as a librarian as well as in marketing, but opportunities in his area are limited, and his vision problems prevent him from doing the work for which he is otherwise most qualified.

151. If Mr. Bricken loses Medicaid, the consequences would be severe. He cannot afford the health care services he needs out of pocket. He would be unable to access his eye specialists or the medications that are critical to preserving the vision he still has. Mr. Bricken is frightened by the prospect of facing new eye complications without coverage and without physicians who know his history.

152. The loss of coverage would be equally serious for his mental health conditions. Mr. Bricken was hospitalized in 2012 when he was not prescribed a high enough dose of his anti-depressants. Without access to his prescription medications and his therapist, he worries about suffering similar consequences, especially as he now has so many vision issues.

153. Plaintiff Emily Byrd is 25 years old and lives in Kansas City, Missouri.

154. As a child, Ms. Byrd had an individualized education program to accommodate her unique learning needs. During her childhood she received therapy for her mental health, and on one occasion was hospitalized after experiencing delusions.

155. Ms. Byrd graduated from high school in 2020 and began training to become a certified nursing assistant (CNA). Due to her mental health conditions, she was unable to complete CNA training.

156. Ms. Byrd has worked as an assistant manager, cashier, and day stocker at three different retail stores. She obtained her most recent position with the assistance of Vocational Rehabilitation, but she is not currently working.

157. Ms. Byrd has been diagnosed with autism spectrum disorder (ASD), obsessive compulsive disorder (OCD), post-traumatic stress disorder, social anxiety, social phobia, recurrent major depressive disorder that is resistant to treatment, attention deficit hyperactivity disorder, and gender dysphoria.

158. Medicaid enables Ms. Byrd to receive the care she needs to manage symptoms caused by her health conditions. She attends therapy, sees her psychiatrist and other medical doctors including an ear, nose, and throat doctor regularly, receives a monthly injection to manage her depression and OCD, and takes several other oral prescription medications.

159. Ms. Byrd lives in a transitional program that offers several services, including supported housing in an apartment setting, community support services, individual counseling, psychiatric evaluations, medication management, vocational/educational support, daily living skills, and art therapy. Some of these services are reimbursed by Medicaid, and to participate in the program, an individual must be Medicaid-enrolled.

160. Since graduating high school, Ms. Byrd has experienced a loss of Medicaid coverage on two separate occasions. Each time she lost access to necessary services and her conditions worsened as a result. Her lapse in Medicaid coverage resulted not from any problem with her eligibility, but from the recertification process itself. She submitted the requested documentation and cooperated throughout the process. Yet she received late notices, duplicate letters, and confusing, inconsistent information that made it difficult to work with the state agency. To resolve the second lapse, she ultimately had to reapply to regain coverage.

161. Under the Medicaid Act, Ms. Byrd qualifies as medically frail because she has a disabling mental disorder. Under the IFR, however, she will only be excluded from the work

requirements as medically frail if she can show that her health conditions significantly impair her ability to comply with the work requirements.

162. Ms. Byrd does not fall within any other category of specified excluded individuals. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(I)-(IV), (VI)-(IX).

163. Ms. Byrd does not know how she will comply with the work requirements.

164. Without Medicaid, her conditions, including major depressive disorder that is resistant to treatment, would likely go untreated and result in a resurgence of suicidal ideation. Losing Medicaid coverage would put her life at risk.

165. Plaintiff Lauren Bush is 36 years old and lives in Burlington, North Carolina.

166. In 2011, Ms. Bush earned a degree in Communications Studies from University of North Carolina, Wilmington. After she graduated, she struggled to find a job in her field. In 2017, she started to work as an independent contractor testing websites and applications.

167. Ms. Bush went to the emergency room in February 2026 with what she thought was the flu. In fact, she had diabetic ketoacidosis, a life-threatening condition that can be the first sign of diabetes. She was diagnosed with type I diabetes and admitted to the ICU.

168. At the time, Ms. Bush did not have health insurance because she could not afford it. A hospital social worker helped her enroll in Medicaid, which covered her hospital expenses.

169. Medicaid enables Ms. Bush to receive the care she needs to keep her diabetes under control. She takes two different kinds of insulin. She uses various medical supplies and devices, including a glucose monitor, test strips, lancets, and lancing devices to test her blood sugar, and needles to administer insulin. She sees an endocrinologist and has blood work done regularly.

170. In addition, Ms. Bush takes a prescription medication for diabetic neuropathy, a common complication of type I diabetes. She gets pulsating waves of pain, sometimes in one place

at a time (*e.g.*, her feet or legs), and sometimes all over her body. The pain makes it difficult for her to sit without support and to walk or stand for long. Medication makes the pain more bearable.

171. Ms. Bush still works as an independent contractor but has been unable to get more than one to two hours of work each month over the last three months. As a result, she has made less than $100 per month. She lives with her parents to keep her expenses low.

172. In early July, Ms. Bush received a letter from her local department of social services that described Medicaid work requirements and who would be considered exempt.

173. Under the Medicaid Act, Ms. Bush qualifies as medically frail because she has a serious or complex medical condition. Under the IFR, however, she will only be excluded from the work requirements as medically frail if she can show her type I diabetes significantly impairs her ability to comply with the work requirements. The IFR states that CMS does not expect that people with type I diabetes will typically meet that standard. 91 Fed. Reg. at 33376.

174. Ms. Bush does not fall within any of the other categories of specified excluded individuals. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(I)-(IV), (VI)-(IX).

175. Ms. Bush does not know how she will comply with the work requirements. She has been looking for a better job for some time but has not been able to find one. There are limited jobs in her area, and her diabetic neuropathy limits the kinds of work and volunteer activities that she can do.

176. Even if she could find more work, attempting to work more hours would take a serious toll on her health. It would cause her nerve pain to increase because she would be pushing herself to perform tasks she is not strong enough to do. And, when her nerve pain worsens, her emotional health suffers.

177. Losing Medicaid coverage would put her life at risk. Without Medicaid, Ms. Bush has no way to afford the insulin and related supplies and medication she needs to stay alive. It causes her great stress and anxiety to think about how her life and well-being are being compromised by this rule.

The Provider Organizations

178. Medical providers, including clinicians who are members of ACP, AAP, SAHM, DFA, NHMS, and NHAAP, will be irreparably harmed by the effects of the rule. As more people lose Medicaid coverage due to the IFR's restrictions, these clinicians will be more likely to see patients who delay care until their needs are acute. They will receive less than full reimbursement for those patients who lose insurance, and they will lose contact with many patients altogether, particularly in low-income communities. The IFR will thus force medical providers to direct more time to providing uncompensated care, more administrative time to determine whether insurance coverage is possible, and more time to locate patients no longer seeking care for serious conditions.

179. When these clinicians provide uncompensated care to a patient who has lost health care coverage, their work does not end with the patient visit. Often, they have to find a specialist willing to provide care, try to find an alternative medicine a patient may be able to afford but is not optimal, and intervene on behalf of a patient in an attempt to get testing or procedures performed. The end result is additional time for which these clinicians do not get paid, but that also detracts from patient care. Due to the IFR, medical providers will expend more time and effort, receive less compensation—threatening the continuation of medical practices, particularly in rural areas—and be unable to provide optimal care to their patients.

180. The IFR—through the medically frail definition and its onerous verification procedures—also requires medical providers to make medical frailty determinations they are ill-

suited to make. Clinicians, including the members of ACP, AAP, SAHM, DFA, NHMS, and NHAAP, will be required to assess whether a patient's medical condition "significantly impairs" their ability to meet the work requirements, but the IFR does not provide clear criteria for them to undertake that assessment. The imposition of this responsibility on clinicians will cause patients to schedule appointments solely to obtain Medicaid eligibility documentation, reducing the overall capacity of clinicians to provide services.

181. This will come at the expense of patient care. The time clinicians, including the members of ACP, AAP, SAHM, DFA, NHMS, and NHAAP, spend filling out eligibility-related paperwork will eat into the limited time that would otherwise be available for evaluating symptoms and counseling patients. The IFR's restrictions will impose additional burdens for providers who are already operating with constrained capacity. Medicaid patients will suffer in particular, given these patients often have multiple and complex medical, behavioral health, and social needs that must be addressed in a single visit.

182. The rule's new documentation requirements will also damage the patient-physician relationship that is the basis for effective care. Both patients and clinicians depend on the understanding that the health care visit will focus on the patient's health care needs and confidential discussions of those needs during the course of seeking medical care. The rule's documentation requirements will create a conflict between clinicians' duties to complete the required documentation and their need to communicate comprehensively with their patients and provide optimal medical advice on the basis of those communications.

183. Dr. Susan Y. Lee is a member of ACP. Dr. Lee, a board-certified Internal Medicine physician, is the Medical Director of a large faculty practice at SUNY Stony Brook, which is the only safety net system and hospital in its county. Dr. Lee serves many patients who rely on

Medicaid, including patients covered under the Medicaid expansion. The IFR's work requirement-related eligibility and verification provisions will create barriers to healthcare coverage for her patients who are eligible for Medicaid while simultaneously increasing administrative burdens on physicians and healthcare teams. The IFR will require her to make medical frailty determinations for her patients, which will interfere with her doctor-patient relationship with those patients. The likely result will be lost revenues for her practice, poorer health outcomes for her patients, higher rates of uncompensated care, moral distress, and broken relationships in addition to the added strain on an already challenged primary care workforce.

184. Dr. Christine Arsnow is a member of AAP and NHAAP and a board-certified pediatrician practicing in New Hampshire. She provides primary and preventive care to children and families who rely on Medicaid, including adults ages 19-22 who are enrolled through the Medicaid expansion. Dr. Arsnow regularly treats patients with chronic medical conditions and other health needs. Many of her patients, or the parents of her patients, will lose Medicaid coverage because of the IFR's eligibility and verification provisions. When their parent loses coverage, children often experience disruptions in preventive and medically necessary care, yet many continue to seek treatment, resulting in uncompensated care burdens on pediatric providers and their practices. As a result, Dr. Arsnow and her practice will incur greater rates of uncompensated care in treating her patients. In addition, the IFR will require Dr. Arsnow to make medical frailty determinations for her patients, which will require her to perform functions outside her ordinary role as a treating clinician. These obligations will divert time and resources away from direct patient care, interfere with her ability to provide timely medical services, and impose additional burdens on her practice and patients.

<u>The City of Columbus</u>

185. As stated above, Columbus, through its Department of Public Health, provides a wide range of services on behalf of its residents. The city also subsidizes a community health center, which serves residents regardless of insurance coverage; a number of specialty clinics that each focus a particular area, such as dental services and family planning; and a collection of eleven neighborhood health centers dedicated to the health care needs of vulnerable, uninsured, and underinsured residents. Columbus receives compensation when it provides these services to Medicaid beneficiaries, but it is not compensated when it provides these services to uninsured individuals. The increase in the number of uninsured individuals resulting from the rule would lead to a greater burden on those city services and lower reimbursement, which, in turn, will impose additional costs on the city.

186. In addition, Columbus maintains first-class emergency medical services (EMS) through the Columbus Division of Fire. That system dispatches ambulances to meet urgent health needs, regardless of whether the call comes from an individual who has health insurance or is otherwise able to pay for the service. Although reimbursement is sought from patients' Medicare, Medicaid, or commercial health insurance provider where applicable, Columbus serves uninsured residents equally and recoups only a small fraction of its costs for EMS transport for uninsured residents. Uninsured residents are also more likely to delay care until conditions become serious and therefore more likely to require EMS transport. An increase in the number of un- or underinsured individuals will thus result in more EMS transports for which Columbus does not receive reimbursement, and the city must make up for this budget shortfall.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (Contrary to Law)

187. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

188. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

189. The IFR is a "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review. *Id*. § 704.

190. The following provisions in the IFR violate the Medicaid Act and are therefore "not in accordance with law":

a. the definition of medically frail in 42 C.F.R. § 435.554(c)(5)(i) is contrary to 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V), to the extent that it eliminates from the medically frail exclusion an individual who falls within one of the five categories listed in the statute, but who cannot establish that their health condition significantly impairs their ability to comply with the work requirements; and

b. the definition of an individual with a substance use disorder in 42 C.F.R. § 435.554(c)(5)(i)(B) is contrary to 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V)(bb), to the extent that it eliminates from the medically frail exclusion an individual with a substance use disorder who is in stable recovery.

191. Accordingly, this Court must hold unlawful and set aside the aforementioned provisions of the IFR.

**COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(Arbitrary and Capricious)**

192. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

194. The IFR is a "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review. *Id*. § 704.

195. In adopting the following provisions, Defendants relied on factors Congress did not intend for them to consider, failed to consider important aspects of the problem, failed to provide an explanation, failed to explain why previous agency policies were being rejected, and/or failed to consider reasonable alternatives:

a. the definition of medically frail in 42 C.F.R. § 435.554(c)(5)(i);

b. the definition of an individual with a substance use disorder in 42 C.F.R. § 435.554(c)(5)(i)(B);

c. the prohibition on the use of claims and encounter data older than 12 months to verify medically frail status on an *ex parte* basis in 42 C.F.R. § 435.557(f)(1), 435.557(a)(vii), (viii), and 91 Fed. Reg. at 33405; and

d. the limits on the use of self-attestation to verify medically frail status in 42 C.F.R. § 435.557(f)(ii).

196. As a result, the aforementioned provisions are arbitrary and capricious.

197. Accordingly, this Court must hold unlawful and set aside the aforementioned provisions of the IFR.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask that this Court:

1. Declare that the provisions of the IFR identified in Counts I and II are contrary to law and arbitrary, capricious, without observance of proper procedure, or otherwise not in accordance with law under the Administrative Procedure Act;

2. Stay the effective date of the provisions of the IFR identified in Counts I and II under 5 U.S.C. § 705;

3. Vacate and set aside the challenged provisions of the IFR identified in Counts I and II under the Administrative Procedure Act;

4. Preliminarily and permanently enjoin Defendants from implementing the challenged provisions identified in Counts I and II;

5. Award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

6. Grant such other and further relief as the Court may deem just and proper.

Dated: September 18, 2026

Respectfully submitted,

*/s/ Joel McElvain*
Joel McElvain (Bar No. 31673)
Anashua Dutta*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 935-2082
jmcelvain@democracyforward.org
adutta@democracyforward.org

*/s/ Jane Perkins*
Jane Perkins*
Catherine McKee*
Katherine DeBriere*
National Health Law Program
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27514
(919) 968-6308
perkins@healthlaw.org
mckee@healthlaw.org
debriere@healthlaw.org

Meghan P. Carter*
Legal Council for Health Justice
17 N. State St., Ste. 900
Chicago, IL 60602
(312) 605-1979
mcarter@legalcouncil.org

Adam Mueller*
Indiana Justice Project
1100 W. 42nd St., Ste. 200
Indianapolis, IN 46208
(317) 912-1135
amueller@injp.org

James M. Smith*
Legal Aid of Western Missouri
4001 Dr. Martin Luther King Jr. Blvd.
Ste. 300
Kansas City, MO 64130
(816) 474-6750
jsmith@lawmo.org

*Counsel for Plaintiffs*

** Applications for admission pro hac vice forthcoming*